IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2018 Session

## STATE OF TENNESSEE v. EARNEST COSTOSTENO WOODLEY

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-3198    Monte Watkins, Judge**

_____

### No. M2018-00217-CCA-R3-CD

_____

A Davidson County Criminal Court Jury convicted the Appellant, Earnest Costosteno Woodley, of four counts of attempted first degree premeditated murder, and the trial court sentenced him as a repeat violent offender to four concurrent terms of life without parole. On appeal, the Appellant contends that the trial court erred by admitting evidence in violation of Tennessee Rule of Evidence 404(b), that the trial court erred by allowing irrelevant and highly prejudicial cross-examination of his mental health expert, and that the evidence is insufficient to support the convictions because the State failed to show premeditation and because he established the defense of insanity. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Manuel B. Russ (on appeal) and Elaine Heard (at trial), Nashville, Tennessee, for the appellant, Earnest Costosteno Woodley.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Kirsten Kyle-Castelli and Roger Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On June 14, 2013, the Appellant shot Nicole Luke and three of her daughters: K.S., who was fifteen years old, and K.L. and D.L., who were fourteen-year-old twins.[1] In November 2013, the Davidson County Grand Jury indicted the Appellant for four counts of attempted first degree premeditated murder and four counts of employing a firearm during the attempt to commit a dangerous felony. The Appellant filed a notice that he intended to rely on an insanity defense and introduce expert testimony at trial to support that defense. The Appellant's 2015 trial resulted in a hung jury. The State dismissed the four counts of employing a firearm during the attempt to commit a dangerous felony and retried the Appellant on the four counts of attempted first degree premeditated murder.

At the 2016 retrial, Ms. Luke testified that she met the Appellant in Memphis in 2008 or 2009. At that time, Ms. Luke had four daughters: K.S., K.L., D.L., and D.S.[2] Ms. Luke also had a son, R.P. Ms. Luke and the Appellant had a baby girl together and moved to Nashville in August 2010. She stated, "We were a happy family. We used to do a lot of things with the kids when we first moved to Nashville. We would go to Nashville Shores, to the park, out to eat. We were always doing things as a family." Ms. Luke said that the Appellant and her oldest daughter, K.S., "kind of had an issue" but that she "assumed it was from [K.S.] going through teenage years and just being rebellious or whatever." The twins had "a really good" relationship with the Appellant, and the Appellant treated Ms. Luke's son like his own son. Ms. Luke worked for two and one-half years as a certified nurse assistant at Summit Hospital in Nashville. The Appellant was "very attentive" to their daughter, A.W., and he kept A.W. when Ms. Luke was working so that A.W. never went to daycare.

Ms. Luke testified that in January 2013, her relationship with the Appellant began to change. She said that he was "a little more controlling" and that they argued more frequently. Ms. Luke wanted to move back to Memphis because "one of the older girls was getting in a lot of trouble" and because Ms. Luke had friends and family in Memphis. Ms. Luke discussed moving with the Appellant, but he "really didn't want to come back to Memphis, so it went on from there." She stated that over the next six months, his controlling behavior increased and that he "wanted to go with me everywhere I went, every move I made." He also tried to convince Ms. Luke not to return to Memphis.

Ms. Luke testified that she and the six children were supposed to move to Memphis on June 14, 2013. The Appellant was not living with them at that time because he and Ms. Luke had had an argument on June 2. Ms. Luke explained to the jury that on June 2, the Appellant wanted her bank card so that he could buy something. However,

---

[1] It is the policy of this court to refer to minors by their initials.
[2] D.S. was not present on the day of the shooting.

the card contained Ms. Luke's money for the move to Memphis.  She was afraid he would spend the money, so she refused to give him the card.  During the argument, the Appellant pushed and kicked Ms. Luke.  Afterward, Ms. Luke and the children left their apartment for three days.  On June 5, Ms. Luke spoke with the Appellant on the telephone and told him that she would not return to the apartment as long as he was there.  The Appellant went to stay with his cousin, John D. Whitehorn, so Ms. Luke and the children returned home.  Ms. Luke was still planning to move to Memphis, and she did not want the Appellant to move with her.  The Appellant was going to remain in Nashville, and their pastor was trying to help him rent an apartment so he would have a place to live.

Ms. Luke testified that after the June 2 incident, the Appellant was "being extra nice, really nice, just trying to convince [her] to let him back in and really calm."  The Appellant told her that he wanted to go to Centerstone, a mental health facility, so she took him there.  Ms. Luke said she and the Appellant had had "several conversations" about his mental health previously and that he had tried to get disability for mental illness.  However, "it had been denied several times."  Ms. Luke said that the Appellant had been prescribed medications for his mental health but that he never took them.

Ms. Luke testified that on June 7 or 8, the Appellant wanted to take A.W. to Memphis to visit his mother.  Ms. Luke was afraid the Appellant would "try to run off" with A.W., so she and the children went to Memphis with him.  They all returned to Nashville two or three days before Ms. Luke and the children were supposed to move to Memphis.  At first, Ms. Luke and the children were staying in their apartment, and the Appellant was staying with Mr. Whitehorn.  However, the day before the move, the Appellant came to stay with Ms. Luke so he could load her U-Haul.

Ms. Luke testified that on the morning of June 14, she awoke to find that her purse and telephone, which had been beside her when she went to sleep, were gone.  She said that the Appellant had to have taken the items because "there was nobody else that would have moved my stuff."  Later that day, Ms. Luke, K.S., K.L., D.L., and A.W. drove to Mr. Whitehorn apartment.  The Appellant and R.P. followed in the U-Haul.

Ms. Luke testified that the Appellant and R.P. went into Mr. Whitehorn's apartment.  Ms. Luke was not planning to go into the apartment, but the Appellant wanted her and the girls to "'come up.'"  Ms. Luke, K.L., and A.W. went upstairs to the apartment while K.S. and D.L. waited in Ms. Luke's Chevrolet SUV.  Ms. Luke told the Appellant that they needed to leave for Memphis so she could get the key to her new apartment by 5:00 p.m.  The Appellant responded, "'You lie so much; you play so many games.  We're gonna call my brother and get this straightened out.'"

- 3 -

Ms. Luke testified that the Appellant was standing in the kitchen, that Mr. Whitehorn was sitting on the couch, and that R.P. and A.W. were sitting beside Mr. Whitehorn. K.L. was sitting on a loveseat. Ms. Luke then stated as follows:

> After he said that I was playing games, he went to the door and had his left hand on the door. He cracked the door open like he was going out, and he said he was gonna call his brother and that we were gonna get this straightened out. Then he reached in his right [front] pocket, and I assumed he was pulling out a phone.
>
> But he pulled out a gun and pointed it at me. When he did that, I started standing up, because I was sitting in a chair. I started standing up, and the next thing I knew, I was shot.

Ms. Luke testified that the bullet grazed her chest and struck her jaw, shattering her jawbone. She heard two more gunshots, and the Appellant went out the front door. Mr. Whitehorn ran to the bathroom, and Ms. Luke told her children to hide because she did not know if the Appellant was going to return. Ms. Luke realized K.L. had been shot in the chest, so she got a towel and held it against K.L.'s wound. Ms. Luke went to the window and saw the Appellant standing by her car. He fired into the car and ran, and a neighbor called 911.

Ms. Luke testified that a metal plate had to be placed in her jaw and that she had chronic pain. She could not open her mouth "all the way" or eat certain foods, and she was going to need reconstructive surgery so a bone from her hip could be put in her jaw. The bullet that struck K.L. entered K.L.'s chest about one inch from her heart, and K.L. had to have surgery to remove the bullet. The Appellant shot K.S., who had been sitting in the front passenger seat of Ms. Luke's SUV, twice. One bullet struck K.S.'s liver, and the other struck her spine, paralyzing her "from the chest area down." K.S. had surgery followed by physical therapy for two months. The Appellant shot D.L., who had been sitting behind K.S., one time in the leg. D.L. did not need surgery because the bullet "went in and came out the other side."

Ms. Luke testified that the Appellant never expressed an interest in moving back to Memphis and that she never knew him to carry a gun. He never told her that he was hearing voices, that people were out to get him, that he was seeing people wearing white shirts, or that he was seeing Mercedes Benzes. On the day of the shootings, the Appellant had been "acting like he normally would." Ms. Luke said that the Appellant shot her with her own gun, a forty-four-caliber Rossi revolver, Model R44102, and that she had bought semi hollow-point bullets for the weapon. She kept the gun in a "clothes

- 4 -

tote" with a lid on it, and she last saw the gun on June 5 or 6. The tote was in a padlocked closet, and a key to the padlock was on the key ring for Ms. Luke's vehicle. The Appellant packed the clothes totes from Ms. Luke's closet into her U-Haul. After Ms. Luke was released from the hospital, she searched her SUV and found a fired bullet. She gave the bullet to a detective.

On cross-examination, Ms. Luke testified that she thought the Appellant shot her "because I didn't want to be with him anymore." She acknowledged, though, that he helped her pack her U-Haul for the move to Memphis and that he was going to drive the U-Haul to Memphis for her. She denied that she and the Appellant went on a "vacation" to Memphis just before the shootings and said she went to Memphis with him because she did not want A.W. to go with him alone. The Appellant had told Ms. Luke previously that a doctor had diagnosed him with schizophrenia. However, the Appellant also told her that "he did not have that disorder, that he was just putting on" so he could receive disability. On redirect examination, Ms. Luke testified that the Appellant was supposed to stay with his brother, who lived in Memphis, when they arrived in Memphis on June 14.

Seventeen-year-old K.L. testified that she and the Appellant had a good relationship and that she treated him like a father. The Appellant treated A.W. "better" than the other children because A.W. was his biological child, and K.S. "got in trouble a lot, so he treated her worse." K.L. stated that the Appellant was usually happy but that "[w]hen he got mad, you just didn't want to be around him. We kind of left him alone." However, she was never afraid of him. In early June 2013, the Appellant "just started acting like he just wanted to be to himself" and went to stay with his cousin, John Whitehorn. K.L. said that she did not know why the Appellant moved out but that "I just guessed that he and my mom broke up." Even though the Appellant went to stay with Mr. Whitehorn, the family accompanied the Appellant to Memphis to visit his mother. K.L. said that the Appellant acted normal during the trip and that "[w]e had fun."

K.L. testified that the Appellant was going to help her mother and the children move to Memphis and that he was going to return to Nashville. In the days leading up to the move, he "really didn't talk much like he normally did" but did not seem mad or depressed. K.L did not know her mother owned a gun, and she never knew the Appellant to carry a firearm. K.L.'s mother had three vehicles. On the day of the move, K.L. was going to ride to Memphis in one vehicle with her mother, D.L, K.S., and A.W, and the Appellant and R.P. were going to drive the U-Haul and tow a second vehicle. Mr. Whitehorn was going to drive the third vehicle. The family drove to Mr. Whitehorn's apartment to pick him up. When they arrived, K.L. and her mother went inside while K.S. and D.L. waited in their mother's SUV.

K.L. testified that her mother and the Appellant had a "discussion" about when they should leave for Memphis. K.L.'s mother wanted to leave right away, but the Appellant wanted to wait. K.L. said that the Appellant walked from the kitchen to the front door and that he told K.L.'s mother that "he wanted her to call his brother and tell him everything." K.L. did not know what the Appellant meant by that statement. The Appellant reached into his pocket, and K.L. thought he was going to pull out his cellular telephone. Instead, he pulled out a gun.

K.L. testified that the Appellant shot her in the arm and chest and that she blacked out. When she awoke, blood was "everywhere," and her mother was "running around making sure everybody was okay." K.L. walked outside and saw D.L., who had been shot in the leg, walking up the stairs. The girls went into the bathroom of the apartment, and D.L. got into the bathtub while K.L. "laid on the floor." K.L. stated that the bullet in her chest traveled to her back, that "it had to stay [there] for about a year or two," and that she had to have the bullet removed because it was causing pain in her arm. She said that D.L. never got into trouble prior to the shootings but that D.L. began running away after the shootings. K.L. never heard the Appellant say that he was hearing voices or that people were out to get him. On cross-examination, K.L. testified that she never expected the Appellant to shoot her and that he had no reason to do so.

Detective Michael Mooney of the Metropolitan Nashville Police Department (MNPD) testified that about 2:30 p.m. on June 14, 2013, he was dispatched to a "shots fired" call and was the first officer to arrive at the apartment complex. He said that "people were running every which way" and that the scene was "rather chaotic." Detective Mooney approached a white Chevrolet and saw a young female in the front passenger seat. She "appeared to be suffering some medical distress" and was going in and out of consciousness. Detective Mooney saw a lot of blood in her chest area, and she could not communicate with him. He stayed with her until emergency medical technicians arrived.

Detective Mooney testified that he and another officer then went upstairs to Mr. Whitehorn's apartment and that a second female was sitting on the couch. She appeared to have at least one gunshot wound in her neck and appeared to be unconscious. Detective Mooney determined she was breathing and tried to communicate with her, but she did not respond. He began searching the apartment and found two additional female victims in the bathroom. They appeared to be in shock and were "scrambling around." He saw a lot of blood and thought they had been shot. Detective Mooney never saw anyone with a weapon and never identified anyone at the scene as the shooter.

Sergeant Andrew Kooshian of the MNPD testified that he was dispatched to the apartment complex. When he arrived, Detective Mooney was at the passenger side of a

white SUV. Sergeant Kooshian went to him, and they saw a blood trail that went from the parking lot, up a stairwell, and to the open door of an apartment. When medical personnel arrived, the two officers left the SUV and went upstairs. They could hear screaming and crying inside the apartment.

Sergeant Kooshian testified that a female was on the couch and was injured in her throat and face areas. Medical personnel were already attending to her, so the officers went to the rear of the apartment and found "two smaller children" in the bathroom. One of them was in the bathtub. The officers later found a male child accompanied by John Whitehorn in the apartment. Mr. Whitehorn was "very helpful" in providing the police with information about the shootings.

John D. Whitehorn, the Appellant's first cousin, testified that he had known the Appellant for forty-one years, and he acknowledged that they were "close" as children. Mr. Whitehorn served time in prison for attempted first degree murder and was released in March 2012. He moved to Nashville and contacted the Appellant "after not seeing him for so many years."

Mr. Whitehorn testified that he interacted with the Appellant, Nicole Luke, and their family and that he thought the Appellant and Ms. Luke had a good relationship. In June 2013, Mr. Whitehorn was living in the Brickhaven Apartments in Madison. On June 2, the Appellant came to stay with him for one week. The Appellant, Ms. Luke, and the children then went to Memphis. When they returned to Nashville, the Appellant stayed with Ms. Luke at her apartment, and Mr. Whitehorn thought the Appellant and Ms. Luke were back together as a couple. He assumed the Appellant was planning to move to Memphis with Ms. Luke.

Mr. Whitehorn testified that he helped the Appellant and Ms. Luke load their U-Haul on the night of June 13 and that he was supposed to drive one of their vehicles to Memphis when they moved the next day. On June 14, Mr. Whitehorn went to work and returned to his apartment so that he could be ready to leave for Memphis at 1:00 p.m. Mr. Whitehorn stated, "They pulled up outside, and I was just gonna lock the door and go." However, the Appellant came upstairs and inside the apartment with A.W. and R.P. Ms. Luke and K.L. also came into the apartment.

Mr. Whitehorn testified that Ms. Luke sat in a chair and asked if they were ready to go. The Appellant said they needed to wait fifteen or twenty minutes, but Ms. Luke did not want to wait. Mr. Whitehorn stated that the Appellant was "in the kitchen moving around" and that the Appellant said Ms. Luke "was always calling and telling his family things that ain't true and that she's gonna call and get that straightened out right now." Mr. Whitehorn thought the Appellant was going to pull out the Appellant's cellular

telephone. Instead, the Appellant pulled a revolver out of his right front pocket and shot Ms. Luke in the face. Mr. Whitehorn immediately ran into the bathroom, held the bathroom door closed, and heard another gunshot. A few minutes later, he heard one or two more gunshots in the distance.

Mr. Whitehorn testified that someone started "beating" on the bathroom door and said, "'Let us in; let us in.'" Mr. Whitehorn opened the door, and Ms. Luke, K.L., D.L., R.P., and A.W. came into the bathroom. K.L. had a bullet hole in her chest, and D.L. had a bullet hole in her leg. Mr. Whitehorn stated, "They was crying and screaming saying that [K.S.] was out in the car dead. Just chaos." Mr. Whitehorn tried to help the victims, and a neighbor telephoned the police.

Mr. Whitehorn testified that he had never known the Appellant to carry a gun and that he never saw the Appellant take any medications. The Appellant's behavior was "normal, just regular," and Mr. Whitehorn did not notice any changes in the Appellant's mood or behavior from January to June 2013. Mr. Whitehorn said that he had never known the Appellant to have mental health issues and that the Appellant never told him that the Appellant was hearing voices. Soon after the shootings, the Appellant telephoned Mr. Whitehorn and asked if A.W. was okay. The Appellant did not ask about Ms. Luke or her daughters.

On cross-examination, Mr. Whitehorn acknowledged that it would have been "abnormal behavior" for the Appellant to carry a gun. He also acknowledged that after the Memphis trip, the Appellant moved back in with Ms. Luke.

Sharon Tilley of the MNPD testified that on June 14, 2013, she was working as a crime scene technician and was dispatched to John Whitehorn's apartment. A white SUV in the parking lot had shattered passenger-side windows, and the front doors were open. A bullet appeared to have entered the rear passenger-side door of the SUV, exited the rear driver-side door, and struck the pavement. However, Ms. Tilley did not find the bullet. Blood was inside the SUV, and blood drops were on the stairs leading up to Mr. Whitehorn's apartment and the patio area outside the apartment. Blood was on the walls and the floor throughout the apartment. A bullet was on the living room floor, and a bloodstain was on the loveseat. Ms. Tilley did not find any cartridge casings or a gun. She later searched the interior of the SUV and found a bullet in the rear driver-side area.

Gwen Gregory testified that in June 2013, she was living in the Brickhaven Apartments. On June 14, she was working in a flower bed when she heard what she thought was firecrackers. She stood up and saw the Appellant come out of an apartment. She said that he "turned back to the apartment, which the door was open, and started firing" into the apartment. Ms. Gregory thought she heard five or six gunshots, and she

"hit the ground." She saw the Appellant run down the stairs and between two buildings. She did not see anything happen around a vehicle.

Detective Nathaniel Ellsworth of the MNPD testified that on June 14, 2013, he went to the scene of the shootings and began trying to find the Appellant. He obtained the Appellant's telephone number and "did what we call phone ping, which is a way we track a phone based on signal sent through the GPS located on the phone." The Appellant's cellular telephone was "ping[ed]" at Veteran's Cemetery on Briley Parkway. The police searched the cemetery but did not find anyone. The phone was later tracked to Interstate 65 North. At 8:40 p.m., the police received the last ping from the telephone just south of Franklin. Detective Ellsworth thought the Appellant was heading to Memphis, so he notified the Tennessee Highway Patrol and other police departments to be on the lookout for the Appellant.

Special Agent Tom Heflin, a forensic scientist for the Tennessee Bureau of Investigation (TBI), testified as an expert in firearms and tool mark identification that he analyzed four bullets collected as evidence. Two of the bullets came from the crime scene, one came from Ms. Luke's SUV, and one was recovered from K.S. All of them were forty-four-caliber semi hollow-point bullets. Agent Heflin researched the rifling characteristics for a Rossi Model R44102 and compared them to the characteristics of the four bullets. He determined that the bullets could have been fired from that model of gun. The gun was a five-shot revolver, and spent cartridge casings would have remained in the cylinder until a person ejected them.

Detective John Timm of the MNPD testified that on June 14, 2013, he went to Vanderbilt Hospital and Vanderbilt Children's Hospital and interviewed the victims. From his investigation, he determined that the Appellant fired six bullets: two upstairs and four downstairs. One bullet was recovered from where Ms. Luke had been sitting in the apartment, one bullet was recovered from K.L.'s body during surgery, one bullet was recovered from K.S.'s body during surgery, and one bullet was recovered from Ms. Luke's vehicle by Sharon Tilley. Ms. Luke found the fifth bullet in her vehicle on June 22, and the sixth bullet entered the passenger side of Ms. Luke's SUV and exited the driver side.

Detective Timm testified that the police arrested the Appellant in Memphis on June 16, 2013, and transported him back to Nashville. A cellular telephone, but no gun or ammunition, was on his person. The police reported Ms. Luke's gun as stolen, and the gun was listed in the National Crime Information Center database. A couple of weeks before trial, Detective Timm checked the database and learned the gun had been found.

Detective Timm testified that the shootings occurred at 2:24 p.m. Upon inspecting the Appellant's cellular telephone records, Detective Timm learned that the Appellant called John Whitehorn at 2:35 p.m. Detective Timm counted twenty-five incoming and outgoing communications between the Appellant and the Appellant's brother after the shootings. On cross-examination, Detective Timm acknowledged that the Appellant voluntarily turned himself in to the police on June 16.

K.S. testified that she was Nicole Luke's oldest child. K.S. described her relationship with the Appellant as "[a]bnormal" and explained as follows: "In the house there were groups of kids. The older kids, we were treated a certain way than the younger kids were treated. The younger kids were treated more like his children, and the older kids, we were treated more like objects to him." K.S. said that she and the Appellant "didn't really get along" and that she "didn't interact with him much."

K.S. testified that on June 2, she was in her bedroom when R.P. knocked on her door. R.P. was "in a bit of a frenzy panicking" and told K.S. that their mother wanted K.S. to call the police. K.S. telephoned the police and left her bedroom to find out what was going on. Ms. Luke was upset and crying, and the Appellant was "pacing." K.S. said that Ms. Luke and the children left the apartment and that the Appellant "was trying to get everybody back inside the house." Ms. Luke and the children spent the night at a friend's house but returned the next day. K.S. described the Appellant as "very secretive" and said he "just got worse" after June 2. She stated, "Till the day of moving he wouldn't really talk to anybody, or he wouldn't respond when somebody asked him a question."

K.S. testified that on June 14, she and D.L. waited in Ms. Luke's SUV while everyone else went upstairs to John Whitehorn's apartment. K.S. was sitting in the front passenger seat, and D.L. was sitting directly behind her. About ten minutes later, K.S. heard "loud sounds" and heard the Appellant coming down the stairs. K.S. thought they were getting ready to leave but heard D.L. yell, "'Oh, my God.'" K.S. looked at the Appellant and saw him "fidgeting with a gun." The State asked her to explain what she meant by "fidgeting," and she stated, "He was fidgeting with the cylinder." K.S. said that she and D.L. "were trying to get him to stop doing whatever he was trying to do" and that they "were trying to apologize to get him to stop." She then told the jury, "He looked at me and said very plainly, 'Sorry for what, nigga?'" The Appellant fired one shot at D.L. and one shot at K.S. The Appellant began "fidgeting" with the gun again, shot at D.L. and K.S. again, and ran behind the apartment building. K.S. saw Ms. Luke come out of Mr. Whitehorn's apartment. Ms. Luke was "holding" her face and told the girls to come upstairs. D.L. got out of the car and ran upstairs, but K.S. was physically unable to unbuckle her seatbelt.

K.S. testified that she sustained one gunshot wound to her liver and that the second bullet went through her armpit and lodged in her spine. She could not move the lower half of her body, had to use a wheelchair, and would never regain her mobility. She stated that she never saw the Appellant with a gun prior to that day and that he never said he was hearing voices. At the conclusion of K.S.'s testimony, the State rested its case-in-chief.

Dr. James Walker testified for the Appellant as an expert in neuropsychology that he had a doctorate degree in clinical psychology from the University of Louisville and that he was a faculty member at Vanderbilt University Medical School from 1998 to 2010. In 2010, he went into private practice. At the time of the Appellant's trial, he also was the Director of Clarity Evaluation Center. Dr. Walker first met the Appellant in 2005 or 2006 when Dr. Walker worked at the DeBerry Special Needs Facility in Nashville, and he met with the Appellant again in 2014 at defense counsel's request. Dr. Walker met with the Appellant five times in jail between April 11 and September 11, 2014, and he estimated that he spent four hours, fifteen minutes with the Appellant. Dr. Walker's associate spent several additional hours with the Appellant in order to administer various tests to him.

Dr. Walker testified that prior to meeting with the Appellant, he reviewed records related to the shootings and read "two or three criminal history reports" about the Appellant. He also reviewed police reports related to events that occurred in the summer of 2013, judicial subpoenas, victim interviews, the Appellant's waiver of rights form, and a letter written by Dr. Kimberly Brown. In total, Dr. Walker estimated that he had reviewed "a couple hundred" pages of documents. Dr. Walker administered the Test of Memory Malingering to the Appellant on April 11, 2014, and the Appellant did "very well," meaning that there was "no indication of faking or any kind of cognitive or memory problems here." The following tests also were administered to the Appellant on April 11: the Mini-Mental State Examination, which tested cognitive ability; the Wechsler Adult Intelligence Scale, which measured standard IQ or intelligence; the Repeatable Battery for the Assessment of Neuropsychological Status, which tested memory, reasoning, visual, and perceptual skills; the Short Booklet Category Test, which tested reasoning and problem solving; the Structured Interview of Reported Symptoms, another test for malingering; and the Personality Assessment Inventory, which tested mental health symptoms.

Dr. Walker testified that when he met with the Appellant on April 11, the Appellant was "very impaired. He was having difficulty knowing what was going on. He was very delusional." The Appellant was "out of touch with reality" and said things that did not make sense. When Dr. Walker administered the Mini-Mental State Examination to the Appellant, the Appellant "did poorly on this test with cognitive

developing." Between April 11 and August 12, the Appellant was sent to Middle Tennessee Mental Health Institute and was forcibly medicated. Dr. Walker saw the Appellant on August 12 and re-administered the Mini-Mental State Examination to him. The Appellant "performed much better on the test and actually achieved a normal score on the test. There was no indication of any impairment."

Dr. Walker testified that the average IQ was 100 but that the Appellant's IQ was 77, which showed that "he has some real limitations in his thinking and reasoning ability." Dr. Walker stated that the Appellant's IQ was in the sixth percentile as compared to other men his age, "[s]o he's not the sharpest tool in the tool box." The Appellant performed "very poorly" on the Repeatable Battery for the Assessment of Neuropsychological Status and "seemed to be disconnected from reality." On the Trail Making Test, which tested mental processing speed, the Appellant performed "pretty well," meaning that he was "able to think through things at a pretty reasonable degree of speed." On the Short Booklet Category Test, another test for higher order reasoning, the Appellant performed "poorly," meaning that he was not able to solve problems effectively. Dr. Walker described the Appellant as "the kind of person who head butts the problem in the same way over and over and over again and doesn't tend to try out new ways of dealing with things. He goes back to the same failed strategy over and over."

Dr. Walker testified that the Appellant "passed" the Structured Interview of Reported Symptoms. Although the Appellant "scored variably" on some scales of the test, "overall he did not score as a person we would expect to be faking a psychiatric illness." Therefore, Dr. Walker classified the Appellant as a "non malingerer or non faker." The Appellant performed "very poorly" on the Personality Assessment Inventory, meaning that he "endorsed a lot of very serious symptoms of mental illness." Specifically, the Appellant scored "well outside the limits on the Paranoia Scale," "outside of the normal limits on the Anxiety Scale," and "well outside of normal limits on the Schizophrenia Scale." Dr. Walker said that the Appellant "described himself as a person who is overwhelmed constantly with anxiety" and that the Appellant's answers on the Borderline Scale showed that "emotionally he is a wreck." Dr. Walker said that the Appellant had "constant thoughts that other people are out to harm him or get him" and that the Appellant expressed mistrust of Dr. Walker and concern about whether Dr. Walker was there to help him. The Appellant also expressed "doubts" about defense counsel.

Dr. Walker testified that the Appellant had schizophrenia, a very serious brain disease in which "a person's brain loses the ability to think and reason in a logical way," and that the Appellant had paranoid schizophrenia in which he "believed his family was involved in a vast conspiracy with the government and that he was soon going to be set

up to be killed by the government." The Appellant told Dr. Walker that he thought Nicole Luke and the children were planning to have him killed in Memphis and that they were "in cahoots" with the United States government, the FBI, the CIA, and his brother, whom the Appellant described as "a drug dealer in Memphis." Dr. Walker said he was not surprised the Appellant turned himself in to the police after the shootings. He explained, "Mr. [Woodley] has glimpses of reality, and he has persistent delusions that mess up his thinking where he's not able to think in a reasonable, rational way. He might be one way one day and a very different way the next. . . . He's very unpredictable in terms of what he does."

Dr. Walker testified that he had no doubt the Appellant was schizophrenic. He said that the Appellant had had a severe mental illness for many years and that the Appellant was schizophrenic even when he saw the Appellant at DeBerry. The Appellant's treating psychiatrist at DeBerry confirmed to Dr. Walker that the Appellant had "a long history of severe schizophrenia." Defense counsel asked if the Appellant was able to appreciate the wrongfulness of his conduct, and Dr. Walker answered,

> Not as you or I would. Because of living with these delusions, because of living in this unreal world, he wasn't in touch with the same moral feelings that you or I have. You or I might think about taking the life of another person as -- it would be unthinkable to us. We can't imagine any circumstances where that would be something we would consider. In the world that Mr. [Woodley] was living in on June [14]th, 2013, . . . he was in a world where morality didn't matter. He was profoundly consumed with his delusions, and he was terrified that other people were out to hurt him.

Dr. Walker testified that he also suffered from a mental illness, depression, and that his career had been "successful at times and a disaster at other times." Dr. Walker became suicidal as a teenager and decided to go into psychology in order to find a way to "fix" himself. However, he "never was really able to find anything that worked." When Dr. Walker was thirty-five years old, he tried cocaine. He stated, "For the first time in my life, I felt completely okay." Dr. Walker began using cocaine regularly in 1999. In 2003, he went to his supervisor at Vanderbilt and told his supervisor that he had a problem with the drug. His supervisor did not help him. Dr. Walker said that in 2005, his life was "falling apart because of cocaine," that he went to another supervisor, and that he was put into a treatment program for seven weeks. In 2010, Dr. Walker relapsed. He submitted his resignation to Vanderbilt, and it was accepted. In 2012, he relapsed again. A family member reported him to the Board of Psychology, and he signed an

"agreement" with the Board to be monitored. He said that he had been "clean" since February 2013 and that he took random drug screens. Defense counsel asked if Dr. Walker ever used cocaine while he was meeting or working with the Appellant, and Dr. Walker answered, "No. I've never used cocaine and gone to work. I couldn't function when I was high on cocaine. I couldn't even carry on a conversation with anybody."

On cross-examination, Dr. Walker acknowledged that his cocaine use resulted in his being investigated by the States of Tennessee, Kentucky, and Alabama; the American Psychological Association; and the American Board of Professional Psychology. After Dr. Walker completed his seven weeks of treatment in 2005, he remained clean until April 2006. He said that he "primarily was abstinent" from April 2006 until 2010 but that he used cocaine "for a portion of that time." His drug use "almost always" occurred on weekends or on vacation, but he occasionally used cocaine on weeknights. In 2010, Dr. Walker overdosed and was clean for two years until he relapsed again in 2012. He described his addiction as "very serious" and said that it almost killed him. He stopped using cocaine on February 9, 2013, which was one year and two months before he first met with the Appellant about this case.

Dr. Walker acknowledged that he and Dr. Kimberly Brown were colleagues when he worked at Vanderbilt. He also acknowledged that Vanderbilt gave him an opportunity to "get [his] life in order" in 2005 and that he had to resign from his position at Vanderbilt in 2010. However, he denied that Vanderbilt threatened to fire him if he did not resign. He acknowledged that he signed a consent decree with the "State of Tennessee Board" and that by signing the document, he agreed that some of his behavior was unprofessional, dishonorable, or unethical. He then stated,

> I never committed a dishonorable or unprofessional act. If
> that's what I had to agree to in order to move [forward] with
> my license and career. I'm taking responsibility for the fact I
> was using cocaine, but I never did anything unethical.

As a result of the consent decree, Dr. Walker's license was placed on probation for five years, and he had to have regular drug screens. He stated that he lied to his employers about his drug use on "many occasions" but that he "never did so in a professional setting."

Dr. Walker testified that he did not review the Appellant's mental health records from DeBerry or Centerstone for this case. He also did not review the Appellant's mental health assessment conducted by Dr. Stephen Mory the day after the Appellant's arrest or the Appellant's jailhouse telephone calls. Dr. Walker visited the crime scene in April 2014 but never viewed police photographs of the crime scene.

- 14 -

Dr. Walker acknowledged that his "primary" diagnosis of the Appellant was paranoid schizophrenia and said that a "great deal" of the information he relied on to assess the Appellant came from the Appellant himself. The Appellant told Dr. Walker that he was "quick to anger." Dr. Walker was not present for all of the tests administered to the Appellant but was present for the Mini-Mental State Examination and for a portion of the Test of Memory Malingering. He said that on the Structured Interview of Reported Symptoms, another test for malingering that was composed of eight scales, the Appellant scored "what's called a formal classification of honesty on [only] four of those scales." He acknowledged that the Appellant tested "as probable malingering" on one scale.

Dr. Walker testified that the Appellant said he frequently heard voices. However, he did not tell Dr. Walker that he was hearing voices on the day of the shootings. The Appellant said he often saw men wearing white t-shirts "roaming around" and thought the men were following and watching him. He also saw "Mercedes Benzes that were painted white" and thought the cars were "connected to the white shirts." The Appellant told Dr. Walker that he had been prescribed medications at Centerstone before the shootings but that he did not take them. He also told Dr. Walker that initially, he was the one who wanted to move to Memphis and that Ms. Luke did not want to move. At some point, Ms. Luke suddenly changed her mind and agreed to move to Memphis, which made the Appellant very suspicious and reluctant to move back there. The Appellant also claimed he did not agree to move back to Memphis with Ms. Luke until after they returned from their trip to Memphis in June.

Dr. Walker testified that the Appellant admitted to hitting and pushing Ms. Luke on June 2 and to shooting Ms. Luke and her daughters on June 14. All of the witnesses reported "a conflict" in John Whitehorn's apartment just prior to the shootings. However, the Appellant "was not able to describe his precise reasoning" at the time of the shootings. The Appellant told Dr. Kimberly Brown that he also had wanted to shoot Mr. Whitehorn but that A.W. was "in the way." The Appellant claimed Mr. Whitehorn and the Appellant's brother, who lived in Memphis, were part of the conspiracy against him. Despite that claim, the Appellant had a lot of contact with his brother before and after the shootings. When the Appellant was interviewed at the sheriff's office a few days after the shootings, the Appellant said he was not hearing voices at the time of the shootings.

Dr. Walker testified that the Appellant's fleeing after the shootings "was not sufficient evidence to say he was in a good frame of mind and decided to do this horrible thing on his own." Even though the Appellant thought there was a conspiracy to harm him in Memphis, the Appellant fled there. Dr. Walker stated, "Clearly, it doesn't make a lot of sense considering what he was afraid would happen in Memphis when he went there, but that's what he told me." The Appellant also told Dr. Walker that he carried a

gun "habitually." The Appellant cried "profusely" during his interview with Dr. Walker and said he missed his family, including Ms. Luke, K.S., K.L., and D.L. The Appellant said that he regretted his actions and that he wished he had "done something different." The Appellant never mentioned an insanity defense to Dr. Walker. Instead, the Appellant "simply described what was going on in his mind at the time, which led [Dr.Walker] to believe, as a forensic psychologist, that in all likelihood, he was insane at the time." Dr. Walker said that on the day of the shootings, he thought the Appellant understood that the Appellant was discharging a firearm that would hurt somebody but that he did not think the Appellant could appreciate the wrongfulness of the Appellant's actions.

Dr. Walker acknowledged that he did not meet with the Appellant for the first time until April 2014. Dr. Walker said that he was being paid for his time but not his testimony and that the State was going to pay him $150 per hour for his work and $75 per hour for his travel. He said he had billed the State for the five times he met with the Appellant.

On redirect examination, Dr. Walker testified that people with paranoid schizophrenia needed psychotic medications to "straighten out" their thinking. He explained, "If they're not medicated, typically, they don't get better. They continue to be psychotic; they continue to be delusional. They hear voices; they live in a different world than the rest of us."

Dr. Stephen Mory testified on rebuttal for the State that he was a psychiatrist who worked primarily in the Davidson County jails and that his job was to "evaluate and treat people with mental illnesses." Dr. Mory met with the Appellant on June 18, 2013. The Appellant told Dr. Mory that he did not think he needed medications, and the Appellant described his mood as "normal." Dr. Mory asked the Appellant if he had any goals, which was Dr. Mory's way of assessing whether the Appellant was suicidal. The Appellant answered, "'Yes, of course. I want to live for my three-year-old daughter.'" The Appellant told Dr. Mory that he "went to Centerstone about four or five months ago, but he did not stay in treatment."

On cross-examination, Dr. Mory testified that he saw twelve patients on an average day and that he spent twenty to thirty minutes with the Appellant on June 18. The Appellant reported a prior suicide attempt to Dr. Mory and said he was depressed.

Dr. Kimberly Brown testified on rebuttal for the State as an expert in forensic psychology that she was the Director of Psychological Services and an assistant professor at Vanderbilt University. Dr. Brown performed a court-ordered evaluation of the Appellant. She explained that for a court-ordered evaluation, "We don't work for one side or the other. Our job is to collect the information that's requested by the Court and

[report] back to the court." She stated that unlike a court-ordered evaluation, "when you're hired by one side or the other, there is some pressure to pull to the side that hires you for many reasons." The Department of Mental Health paid a "flat rate" for a court-ordered evaluation, regardless of the amount of time needed for the evaluation.

Dr. Brown testified that she received a "variety of information" before and after she interviewed the Appellant, including police reports, crime scene diagrams and photographs, the Appellant's criminal history, call logs from his cellular telephone, the victims' medical records, and testimony previously given in this case. She also reviewed the Appellant's mental health records; listened to 911 calls; and listened to jailhouse telephone calls made by the Appellant. Dr. Brown said that she heard Dr. Walker testify and that she and Dr. Walker agreed on three points: the Appellant had a severe mental illness, his illness "at least partly" caused his criminal actions, and he was able to appreciate the nature of the offense. However, they disagreed on whether the Appellant was able to appreciate the wrongfulness of his actions.

Dr. Brown testified that the Appellant was first treated for mental illness in 2003 when he was twenty-nine-years old and a prison inmate at the DeBerry Special Needs Facility. He was diagnosed with schizophrenia and anti-social personality disorder and treated with psychiatric medications. The Appellant responded very well to treatment and was a model inmate at DeBerry. However, there were times when he was paranoid and thought officers were poisoning his food. He also attempted suicide by hanging. Dr. Brown said the Appellant was not being medicated "when most of these problems happened" at DeBerry. In February 2012, the Appellant was evaluated at the Nashville Mental Health Cooperative. At that time, he complained of feeling angry, paranoid, and anxious; said he was having mood swings and felt worthless; and said he did not want to hurt himself but had thoughts of hurting others. The Appellant told the Cooperative that he had not experienced hallucinations or heard voices in about one and one-half years. The Cooperative did not accept him for treatment, so he went to Centerstone in February 2012 and complained of similar symptoms.

Dr. Brown testified that Centerstone diagnosed the Appellant with schizoaffective disorder, which was schizophrenia plus mood symptoms, and that he began receiving medications and psychotherapy. At some point, Centerstone changed his diagnosis to major depressive disorder with psychotic features. Dr. Brown said that there were "minor differences" in the two diagnoses but that they had "essentially the same symptoms." Centerstone also diagnosed the Appellant with drug dependence and remission, post-traumatic stress disorder, and anti-social personality disorder. In early 2013, the Appellant reported to Centerstone that he was hearing voices sometimes but that he "really couldn't make them out." He also complained of paranoia. However, nothing in Centerstone's records indicated that the Appellant was having delusional

beliefs about the FBI or men wearing white shirts. The Appellant last visited Centerstone on June 7, 2013, about one week before the shootings.

Dr. Brown testified that on June 17, 2013, three days after the shootings, the Appellant was seen by someone in the medical clinic at the Davidson County Sheriff's Office. The Appellant was not hearing voices, and his thinking was organized. Dr. Mory met with the Appellant the next day, and there was no evidence of paranoia or delusions at that time. The Appellant appeared to be anxious, but Dr. Mory did not describe him as guarded or suspicious and did not prescribe any treatment for him. Ultimately, the Appellant was diagnosed at the sheriff's office with anti-social personality disorder. Dr. Brown also diagnosed the Appellant with anti-social personality disorder, meaning that he had been diagnosed with that disorder four times. Dr. Brown described anti-social personality disorder as a "pervasive pattern across a person's life" for disregarding rules, breaking the law, committing crimes, being aggressive, lying, cheating, not holding stable jobs, and "stuff like that." Defendants with anti-social personality disorder did not qualify for an insanity defense because the statute for the defense specifically excluded it.

Dr. Brown testified that she listened to recorded jailhouse telephone calls made by the Appellant, and the State played one of the calls for the jury. The Appellant made the call to his brother on June 24, 2013, just ten days after the shootings. During the call, the Appellant and his brother talked about "an evaluation," and the Appellant told his brother, "'I can beat this.'" Dr. Brown said that the tone of the conversation "seemed pretty normal" and that she did not think the Appellant sounded guarded or suspicious.

Dr. Brown testified that she evaluated the Appellant on July 30, 2013. The Appellant was very cooperative and polite but was very emotional at times. He made good eye contact with Dr. Brown but cried, which caused him to have difficulty speaking. His thinking was logical and organized, and he did not seem suspicious, guarded, or paranoid. However, when the Appellant talked about his family in Nashville and his brother in Memphis, his thinking was not rational and he sounded paranoid. The Appellant thought that Nicole Luke and her three older daughters were "doing something" to his food and that his brother was trying to lure him to Memphis to have him killed. The Appellant told Dr. Brown that he was not hearing voices on the day of the shootings and that he had not heard voices for a few months, which was consistent with his mental health records.

Dr. Brown testified that while Dr. Walker described the Appellant's behavior as erratic, she saw evidence that his behavior was more controlled. For example, the Appellant specifically selected the people he was going to shoot and specifically decided not to shoot other people. The Appellant had wanted to shoot John Whitehorn, but he did not shoot Mr. Whitehorn because he did not want to harm A.W. The Appellant fled the

- 18 -

scene and hid so well that the police were unable to find him despite a massive search. Dr. Brown stated, "Those all suggest to me the knowledge of the wrongfulness of your doing."

Dr. Brown testified that the Appellant's fleeing to Memphis was "odd and inconsistent" with his claim that Memphis was the source of danger. The Appellant also called family members to come get him after the shootings but claimed those family members were part of the conspiracy against him. Finally, the Appellant's having a gun on the day of the shootings, when he did not normally carry a gun, suggested that "[t]here may have been some purpose or thought put into that day." Dr. Brown stated that in her opinion, the Appellant could appreciate the wrongfulness of his actions on the day of the shootings.

On cross-examination, Dr. Brown testified that she met with the Appellant for a total of one hour, forty-five minutes; that she spent much more time reviewing the records in this case than she did with him face-to-face; and that she did not administer any tests to him. She acknowledged that psychiatry was not an "exact science" and was "somewhat subjective" and said that the Appellant "certainly is paranoid at times." Dr. Brown stated that she thought the Appellant was mentally ill, that he was not faking mental illness, and that his mental illness impacted the shootings. She acknowledged that a defendant's fleeing the scene of a crime did not mean the defendant could never be eligible for an insanity defense. She stated, "I have to look at the totality of the circumstances. No one thing excludes anyone from an insanity defense."

On redirect examination, Dr. Brown testified that the tests Dr. Walker administered to the Appellant were usually used to determine whether a person had a significant problem with the person's memory, such as dementia. She said, "These are not tests that are typically used or indicated in an insanity defense evaluation."

At the conclusion of Dr. Brown's testimony, the State rested its case. The jury convicted the Appellant of four counts of attempted first degree premeditated murder, and the trial court sentenced him as a repeat violent offender to four concurrent terms of life without parole.

## II. Analysis

### A. 404(b) Evidence

The Appellant contends that the trial court erred by allowing the State's witnesses to testify about his argument with Nicole Luke on June 2, 2013, because the testimony violated Tennessee Rule of Evidence 404(b). The State argues that the Appellant has

waived this issue and that, in any event, the trial court properly allowed the witnesses to testify. We agree with the State that the issue has been waived.

Before trial, the Appellant filed a motion in limine, requesting that the trial court prohibit the State "from making any statement or implication in voir dire, opening and closing statements or the examination of witnesses of any other crimes Mr. Woodley is NOT charged with, specifically playing a 911 call of an unrelated incident." During Ms. Luke's direct testimony, the State requested a jury-out meeting. The parties retired to the judge's chambers, and the State requested to question Ms. Luke about the argument she had with the Appellant on June 2. Defense counsel asked the State, "I guess my question is what -- how far into it are you going?" The State answered, "I just want to establish motive and intent. There was an argument that day, and things changed with the intent to move. That's when he got moved out to John D's house." Defense counsel asked if the State was going to play the 911 call from the incident, and the State said no. Defense counsel then asked, "So you're just gonna put there was an argument and a 9-1-1 call was placed?" The State answered, "Yes. And the defendant left the house that day." Defense counsel responded, "Okay."

The parties returned to the courtroom, and the State resumed its direct examination of Ms. Luke. Ms. Luke stated that she and the Appellant had an argument about her bank card on June 2 and that he kicked and pushed her during the argument. She also stated that she and the children left their apartment, that she told the Appellant she would not return as long as he was there, and that he left and went to John Whitehorn's apartment. Ms. Luke said that after the incident, she did not want the Appellant to move to Memphis with her.

Tennessee Rule of Evidence 404(b) generally provides that evidence of other bad acts is irrelevant and, therefore, inadmissible. See Tenn. R. Evid. 404(b). The Rule also provides that evidence of other bad acts may be admissible for other purposes, such as "'to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue.'" State v. Moore, 6 S.W.3d 235, 239 n.5 (quoting State v. Hallock, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)).

Before a trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait

and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

During the in-chambers meeting, the State asked to question Ms. Luke about the June 2 incident, and defense counsel's only concern was that the State was going to play the 911 call made by K.S. The State assured counsel that it was not going to play the call, and defense counsel responded, "Okay." Defense counsel did not address the issue further and, accordingly, the trial court did not did not consider and rule on the factors in Rule 404(b). Thus, the issue has been waived. See Tenn. R. App. P. 36(a).

## B. Cross-examination of Dr. Walker

Next, the Appellant contends that the trial court erred by allowing the State to cross-examine Dr. Walker about his cocaine use and professional discipline because the evidence was not relevant to his character for truthfulness and was highly prejudicial. The State argues that the Appellant also has waived this argument and that, regardless, the prosecutor's cross-examination of Dr. Walker was proper impeachment. Again, we agree with the State that the issue has been waived.

Dr. Walker testified at the Appellant's first trial. Prior to his testimony, the State requested to question him about the consent decree he signed. The trial court stated,

> Well, any time you have an expert testify, the issue of credibility is raised, which allows for fair cross-examination with regard to that. I will allow, as much as I see appropriate, delving into that. But, you know, I think there is some limit. I know that cross-examination is wide open in this state, but one could go on ad infinitum, and it wouldn't be appropriate.

- 21 -

So, to what I consider an appropriate degree, I will
allow cross-examination.

During Dr. Walker's direct examination, defense counsel asked him about his "substance abuse issue" and the consent decree. The State cross-examined him about the consent decree and the loss of his job at Vanderbilt, asking many of the same questions the State would ask at the Appellant's retrial. Defense counsel objected only one time: when the State asked Dr. Walker to identify his "supplier." The trial court ruled that the question was irrelevant and sustained the objection.

Prior to the Appellant's retrial, he filed a motion in limine, requesting that the trial court not allow the State to question Dr. Walker about his "previous cocaine usage, disciplinary history, or the consent order related thereto." In the motion, the Appellant advised the trial court that Dr. Walker recently had testified as an expert for the State in a Maury County criminal trial and that the Maury County Circuit Court had determined that Dr. Walker's disciplinary history was inadmissible. The Appellant attached to his motion the circuit court's written order setting out its ruling. According to the order, the circuit court found that because Dr. Walker was a licensed professional, questions regarding his professionalism were relevant under Tennessee Rule of Evidence 402. However, the court also found that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under Tennessee Rule of Evidence 403.

Prior to Dr. Walker's testimony at the Appellant's retrial, the State advised the trial court that Dr. Walker "is under suspension at this time." The State argued that it should be allowed to question Dr. Walker about his cocaine use and "the situation at Vanderbilt" because "[h]e's being held out as an expert" and "[h]e's giving an opinion." The trial court stated, "I think I will do as I did last time. I will listen to what develop[s] here. And as far as objections, I will sustain or overrule as the case may be." Dr. Walker testified extensively on direct examination about his cocaine use and the consent decree. During the State's cross-examination, defense counsel never objected to the State's questions about his drug use or the consent decree.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse

appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 608(b) provides that

> [s]pecific instances of conduct of a witness for the purpose of attacking . . . the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination.

Before a witness can be questioned, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry," and the conduct must have occurred no more than ten years prior to the commencement of prosecution. Tenn. R. Evid. 608(b)(1), (2). This court reviews a trial court's ruling under Tennessee Rule of Evidence 608(b) under an abuse of discretion standard. State v. Reid, 91 S.W.3d 247, 303 (Tenn. 2002).

As noted by the State, this court has said that "[t]o a large extent, whether the Defendant met his burden of proof as to [an] insanity defense depends upon the credibility of the Defendant's expert witnesses." State v. Richard Anthony Arriola, No. M2007-00428-CCA-R3-CD, 2009 WL 2733746, at *8 (Tenn. Crim. App. at Nashville, Aug. 26, 2009). Here, Dr. Walker signed a consent decree in which he admitted to behavior that was "unprofessional, dishonorable, or unethical," and his license to practice psychology was placed on probation for five years. Apparently, his license was still on probationary status at the time of the Appellant's retrial. Moreover, a panel of this court recently addressed the Maury County Circuit Court's order prohibiting the defendant in that case from cross-examining Dr. Walker about the probationary status of his license or his being professionally disciplined, and the majority held that "a limited inquiry into the status of an expert witness's professional license is admissible to impeach the credibility of the witness." State v. David Lynn Zeigler, No. M2017-01091-CCA-R3-CD, 2019 WL 484647, at *19 (Tenn. Crim. App. at Nashville, Feb. 7, 2019). Thus, we conclude that the trial court did not abuse its discretion by ruling in the instant case that the evidence was, at least to some extent, relevant and proper impeachment under Tennessee Rule of Evidence Rule 608(b).

Although the trial court did not abuse its discretion, defense counsel should have requested a jury-out hearing after the trial court's adverse ruling so that the State could question Dr. Walker about his cocaine use and professional discipline and defense counsel could object and obtain a ruling on any questions counsel thought were improper.

- 23 -

Instead, defense counsel questioned Dr. Walker extensively on direct examination about his cocaine use and his signing the consent decree. While we can appreciate the defense's wanting to be proactive and question its own witness about his professional problems, the defense essentially opened the door to the State's cross-examination. Defense counsel also never objected to any of the State's questions on cross-examination. Therefore, the trial court never had an opportunity before or during Dr. Walker's testimony to determine whether any of the State's questions were relevant to Dr. Walker's character for truthfulness and, if so, whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. We note that at the Appellant's first trial, defense counsel raised one objection, and the trial court sustained that objection. Accordingly, we conclude that the Appellant is not entitled to relief. See Tenn. R. App. P. 36(a).

## C. Sufficiency of the Evidence

Finally, the Appellant contends that the evidence is insufficient to support the convictions because the State failed to show premeditation and because he established the defense of insanity. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the

circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). While the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

A person commits criminal attempt when, acting with the kind of culpability otherwise required for the offense, the person

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a).

The Appellant contends that the only factor that supports premeditation in this case is his use of a deadly weapon on unarmed victims. The State argues that it established premeditation by showing the Appellant had a motive for the shootings; procured a weapon; blocked the apartment door and pretended to reach for his cellular telephone before the shootings; fired multiple times at the victims; reloaded the weapon; and failed to render aid to the victims. The State also argues that the shootings were particularly cruel. We agree with the State.

Taken in the light most favorable to the State, the evidence shows that the Appellant's girlfriend, Nicole Luke, planned to move back to Memphis with her children, including A.W., her child with the Appellant. The Appellant did not want them to move and tried to convince Ms. Luke to stay in Nashville. Ms. Luke refused and scheduled the move for June 14, 2013. Ms. Luke had tried to get the Appellant to move with her. However, after an argument on June 2 in which the Appellant kicked and pushed Ms. Luke, Ms. Luke refused to continue living with him and no longer wanted him to move to Memphis with the family. Nevertheless, the Appellant was planning to help Ms. Luke move by driving her U-Haul to Memphis. Ms. Luke last saw her Rossi forty-four-caliber revolver on June 5 or 6 in a clothes tote in her closet. The Appellant packed Ms. Luke's clothes totes into her U-Haul for the move.

On the afternoon of June 14, Ms. Luke, the Appellant, and the children went to John Whitehorn's apartment to pick up Mr. Whitehorn, who also was going to help Ms. Luke move. Mr. Whitehorn had been planning just to "lock the door and go" when the family arrived, and Ms. Luke had not been planning to go upstairs to Mr. Whitehorn's apartment. However, the Appellant wanted Ms. Luke and her daughters to go upstairs. The Appellant, R.P., A.W., Ms. Luke, and K.L. went up to Mr. Whitehorn's apartment while K.S. and D.L. remained in Ms. Luke's SUV. When Ms. Luke got into the apartment, she told the Appellant that they needed to leave for Memphis. However, the Appellant wanted to wait and accused Ms. Luke of lying and "playing games." He also told her, "'We're gonna call my brother and get this straightened out.'" The Appellant went to the front door and reached into his pocket. Ms. Luke, Mr. Whitehorn, and K.L. thought he was going to pull out his cellular telephone, but he pulled out Ms. Luke's gun and shot her. He then shot K.L. and ran downstairs to Ms. Luke's SUV. K.S. heard the

Appellant coming down the stairs and saw him fidgeting with the cylinder of the gun. She and D.L. begged him to stop and apologized to him. The Appellant looked at K.S. and asked her, "'Sorry for what, nigga?'" He then shot her two times and D.L. one time. The Appellant fled but called Mr. Whitehorn soon after the shootings to ask if A.W. was okay. He never inquired about Ms. Luke or her other daughters. The Appellant later told Dr. Brown that he also had wanted to shoot Mr. Whitehorn but that A.W. was "in the way."

From this evidence, a reasonable jury could have inferred that the Appellant's motive for the shootings was his being angry with Ms. Luke about the move and that he procured her gun while he was packing her U-Haul for the purpose of shooting the victims. On the day of the move, the Appellant went to the front door of Mr. Whitehorn's apartment and acted like he was going to take his cellular telephone out of his pocket. Instead, he took out the gun, shot Ms. Luke and K.L, ran downstairs to Ms. Luke's SUV, and shot K.S. and D.L. All of the victims were unarmed, and the Appellant shot K.S. twice. The State argues that the jury also could have found premeditation because the evidence shows that the Appellant reloaded the gun during the shootings. We agree with the State. Agent Heflin testified that Ms. Luke's gun was a five-shot revolver, Detective Timm testified that the Appellant fired six gunshots, and K.S. testified that she saw the Appellant fidgeting with the revolver's cylinder just before he shot her and D.L. Moreover, the Appellant's looking at K.S. and asking her, "'Sorry for what, Nigga?'" after she begged for her life was additional evidence of premeditation. None of the victims were armed, and the Appellant's shooting a mother and her three children in front of each other and other family members was particularly cruel. In sum, the State presented numerous circumstances from which the jury could infer premeditation by the Appellant.

Regarding the Appellant's insanity defense, Tennessee Code Annotated section 39-11-501 provides:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(b)  As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c)  No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Evidence is clear and convincing when "there is no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence." State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999). On appeal, this court "should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002).

Taken in the light most favorable to the State, we conclude that a reasonable trier of fact could have found that the Appellant failed to establish by clear and convincing evidence that, as a result of a severe mental disease or defect, he was unable to appreciate the nature and wrongfulness of his acts. The parties presented conflicting expert opinions regarding the Appellant's being able to appreciate the wrongfulness of his conduct at the time of the shootings. Dr. Walker testified for the defense that when he met with the Appellant in April 2014, ten months after the shootings, the Appellant was out of touch with reality, delusional, and paranoid and that he diagnosed the Appellant with paranoid schizophrenia. Although the Appellant told Dr. Walker that he frequently heard voices, he did not tell Dr. Walker that he was hearing voices on the day of the shootings. Moreover, the Appellant stated during an interview at the Davidson County Sheriff's Office just a few days after the shootings that he was not hearing voices on the day of the shootings. Nevertheless, Dr. Walker concluded that the Appellant could not appreciate the wrongfulness of the Appellant's actions.

Dr. Brown, who evaluated the Appellant about six weeks after the shootings, testified for the State that the Appellant's thinking was logical and organized, that he told her he was not hearing voices on the day of the shootings, and that he said he had not heard voices for a few months. She said, though, that he was paranoid when he talked about his family and that she diagnosed him with anti-social personality disorder, which was specifically excluded from an insanity defense. The Appellant also was diagnosed with anti-social personality disorder at DeBerry, Centerstone, and the sheriff's office. Dr. Brown agreed with Dr. Walker's conclusions that the Appellant had a severe mental illness, that his illness played a role in the shootings, and that he was able to appreciate the nature of the offense.

However, Dr. Brown disagreed with Dr. Walker's conclusion that the Appellant was unable to appreciate the wrongfulness of his actions. In support of her conclusion, she noted that the Appellant selected the people he was going to shoot and chose not to shoot others, did not shoot John Whitehorn because he did not want to harm A.W., fled the scene and hid so well from the police that they were unable to find him despite a massive search, fled to Memphis even though he claimed Memphis was the source of danger, called family members to come get him after the shootings when he claimed those family members were part of the conspiracy against him, and had a gun concealed on his person on the day of the shootings when he did not normally carry a gun. In addition, the Appellant told his brother during a jailhouse telephone call just ten days after the shooting that "'I can beat this.'" Dr. Brown said that the tone of the Appellant's conversation "seemed pretty normal" and that she did not think he sounded guarded or suspicious. The State played the call for the jury, so the jury was able to make its own determination. Based upon the proof, we conclude that the jury could have reasonably found that the Appellant appreciated the wrongfulness of his conduct and rejected his insanity defense.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE